**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC PHILLIPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14-cv-08138 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| KEVIN MCALEENAN, Acting Secretary, | ) | |
| Department of Homeland Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eric Phillipson worked as a planner for the Federal Emergency Management Agency ("FEMA"), an agency within the United States Department of Homeland Security ("DHS"), from 2012 until his termination in 2015. Phillipson has sued FEMA[1] pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, alleging that he was subjected to discrimination on account of his age and retaliation for complaining about it. Defendant now moves for summary judgment on both of Phillipson's claims. (Dkt. No. 51.) For the following reasons, Defendant's motion is granted.

## BACKGROUND

### I.     Federal Rule of Civil Procedure 56 and Local Rule 56.1

Before summarizing the material facts, the Court must first address Phillipson's violations of Federal Rule of Civil Procedure 56 and Northern District of Illinois Local Rule 56.1. Rule 56 and Local Rule 56.1 set forth the manner in which parties are required to present their factual

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Kevin McAleenan, Acting Secretary, Department of Homeland Security, has been substituted as Defendant in place of John F. Kelly. McAleenan is named in his official capacity. A suit against an individual in his official capacity is treated as a suit against the individual's office. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989). Therefore, the Court construes Phillipson's claims as claims against DHS—specifically, FEMA.

assertions when supporting or opposing a motion for summary judgment. Under Federal Rule 56(c):

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). In addition, the rule allows a party to object that the material supporting or disputing a fact "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Where a party fails to properly support an assertion of fact or address another party's factual assertion, the court may afford the party the opportunity to properly support or address the fact, consider the fact undisputed for purposes of the motion, or grant summary judgment if the motion and facts, including those considered undisputed, show that the movant is entitled to it. Fed. R. Civ. P. 56(e).

Local Rule 56.1 requires the party moving for summary judgment to submit a statement of material facts that it contends are undisputed and entitle it to summary judgment. L.R. 56.1(a)(3). The statement of facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, part of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). In addition, the rule requires the party opposing summary judgment to file a "concise response to the movant's statement." L.R. 56.1(b)(3). The response should respond to each numbered paragraph in the moving party's statement and where the opposing party disputes a fact, it must include specific

references to the affidavits, parts of the record, or other supporting materials relied on to controvert the fact. *Id.* Notably, Local Rule 56.1 does not allow the nonmoving party to set forth nonresponsive additional facts in its response to the statement of material facts. *De v. City of Chicago*, 912 F. Supp. 2d 709, 714–15 (N.D. Ill. 2012). To the extent the opposing party wishes to submit any additional facts, it must do so by submitting a separate statement of additional facts in a similar format to the moving party's statement of facts. L.R. 56.1(b)(3)(C); *De*, 912 F. Supp. 2d at 715 ("It is improper, and a violation of Local Rule 56.1, for the nonmoving party to add additional facts to his Local Rule 56.1(b)(3)(B) response; the nonmoving party's additional facts belong in a ***separate*** statement."). District courts are "entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Consequently, a district court is empowered to penalize noncompliance by striking improperly submitted additional facts or deeming admitted facts to which a party has not properly responded. *See De*, 912 F. Supp. 2d at 711–16.

Phillipson's counsel has violated both Rule 56 and Local Rule 56.1 in numerous ways. First, Phillipson's response to FEMA's statement of material facts disputes the vast majority of those facts. Yet many of the responses fail actually to controvert FEMA's factual allegations. Local Rule 56.1 "is not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (interpreting the local rule that was later renumbered as L.R. 56.1). For example, FEMA states that Phillipson sent an email to Denise Dukes, Chief of FEMA's Specialized Planning Section, stating that Dukes had "fabricated" an issue, criticizing her grammar as "not clear," calling her concerns "spurious" and advocating that her conduct be investigated and prosecuted. (Def.'s Rule 56.1 Statement of Facts ("DSF") ¶ 3, Dkt. No. 53.) Phillipson responds "Disputed,"

but then launches into a long colloquy describing his career experience as a "contracting officer and contracting officer's technical representative" working on billion-dollar programs overseas and his completion of a FEMA training course in April 2011 with "the highest score in the course." Phillipson then accuses Dukes of not being certified through the same FEMA training course at the time of their email exchange, before ultimately concluding that "there was no personal attack on Denise Dukes as alleged by her." (Pl.'s Resp. to Def.'s Rule 56.1 Statement ("PRSF") ¶ 3, Dkt. No. 61.) Phillipson's response did nothing to address the substance of FEMA's factual assertion that he sent an email to Dukes and Wulfkuhle with certain statements. Similarly deficient responses abound throughout Phillipson's response. Thus, in the many instances where Phillipson failed to squarely dispute an asserted fact, the fact will be treated as admitted.

In addition, Phillipson's counsel often introduces new facts in his responses to FEMA's statement of material facts. For example, FEMA states that in September 2013, Wulfkuhle issued Phillipson a performance review of "less than expected" in several areas, which did not affect Phillipson's pay or job responsibilities. (DSF ¶ 29.) In response, Phillipson describes an incident where Wulfkuhle denied his request for a scheduled trip in May 2012 due to lack of funding and then canceled the trip despite Phillipson's arrangement of alternate funding. (PRSF ¶ 29.) Again, a response to a statement of material facts should not contain additional facts that do not meet the substance of the moving party's asserted facts. Any new facts must be introduced in a separate statement of additional facts. Therefore, such nonresponsive additional facts are stricken and will not be considered by the Court.

## II.     Factual Background

Except where otherwise indicated, the following facts are undisputed or deemed admitted due to Phillipson's counsel's Rule 56 and Local Rule 56.1 violations.

At all times relevant to this lawsuit, Phillipson was over 40 years old. (Def.'s Resp. to Pl.'s Rule 56.1 Statement ("DRSF") ¶ 1, Dkt. No. 64.) Phillipson worked as a planner for FEMA Region V in Chicago. (PRSF ¶ 1.) He was hired on October 24, 2010 and ultimately fired on December 14, 2015. (*Id.* ¶¶ 1, 62.) During Phillipson's employment at FEMA, Gustav Wulfkuhle served as Phillipson's direct supervisor and Paul Preusse served as Wulfkuhle's supervisor and Phillipson's second-line supervisor. (*Id.* ¶ 2.) FEMA contends that Phillipson's termination was due to his own misconduct; namely, his poor work performance, repeated violations of FEMA policies and procedures, harassment of coworkers, and failure to follow instructions.

### A.     Phillipson's Work Quality

First, Phillipson received reviews indicating unsatisfactory work performance. In October 2010, Phillipson was assigned as the contracting officer's technical representative for the Combined Federal-State-City Improvised Nuclear Device Response Plan. (DRSF ¶ 3.) Phillipson claims that he "had superior evaluation [*sic*]," but Wulfkuhle gave him a "less than expected" ranking on his performance review. (*Id.* ¶¶ 4–5.) In September 2013, Wulfkuhle again reviewed Phillipson as "less than expected" in several areas. (PSRF ¶ 29.) However, none of those negative reviews affected Phillipson's pay or job duties. (*Id.* ¶¶ 29, 45.)

### B.     Phillipson's Violation of FEMA Policies and Procedures

Additionally, on multiple occasions, FEMA charged Phillipson for violating multiple policies and procedures. For example, Wulfkuhle confronted Phillipson several times for using his travel charge card to make personal purchases. In March 2011, Phillipson's travel charge card

statement reflected the purchase of a U.S. Airways flight for Sarah Jardine, an acquaintance of his. (DSF ¶ 21.) And in September 2012, Phillipson's travel charge card statement reflected the purchase of a United Airlines baggage fee of $25 for Jardine. (*Id.*) Again, on January 2013, the statement reflected a payment of a $10 JetBlue fee for Jardine. (*Id.*) Phillipson attributes some of these charges to a United Airlines frequent flyer account he "shared" with Jardine but otherwise blames the various airlines for wrongly charging his card. (DSF ¶ 22, PSRF ¶ 22.)

In April 2013, Wulfkuhle proposed that Phillipson be suspended for five days for delinquently paying his travel charge card and improperly using the card to pay for a meal at a Bennigan's restaurant in Chicago. (DSF ¶ 17.) Phillipson counters that the date on his charge card statement is inaccurate because Bennigan's had a computer issue that caused credit card charges to be posted on a later date than when they were incurred. (PRSF ¶¶ 17–19.) In addition, Wulfkuhle and Preusse heard from Mary Beth Caruso that Phillipson had his travel charge card suspended or had been delinquent in making payments at least nine times during a one-year period. (DSF ¶ 18.)

In June 2013, Wulfkuhle denied Phillipson's request for four hours of sick leave, explaining that Phillipson failed to personally notify anyone in his supervisory chain of his departure as required by FEMA policy. (*Id.* ¶¶ 24–25.) According to Phillipson, he submitted a leave request online through the approved system, which generated an email to Wulfkuhle. (PSRF ¶¶ 24–25.) In September 2013, Phillipson again requested eight hours of sick leave, which Wulfkuhle denied for the same reason. (DSF ¶ 30.)

On May 7, 2014, Wulfkuhle denied Phillipson's request for nine hours of overtime or compensation for time spent traveling because Phillipson's travel voucher indicated that he was not traveling on that date. (*Id.* ¶ 35.) And on October 3, 2014, Wulfkuhle denied Phillipson's

request for reimbursement for an excess baggage charge because Phillipson did not submit a receipt. (*Id.* ¶ 51.) According to Phillipson, Wulfkuhle denied not only the baggage charge but Phillipson's entire request for reimbursement.[2] (PRSF ¶ 51.)

### C. Phillipson's Harassment of Co-Workers

Phillipson also received reprimands on multiple occasions for harassing other FEMA employees. In September 2011, Phillipson was engaged in email communications with Wulfkuhle and Denise Dukes, Chief of FEMA's Specialized Planning Section, regarding invoices for contractor payments. (DSF ¶ 3.) Phillipson sent an email claiming that Dukes had "fabricated" an issue regarding the invoices, criticizing her grammar as "not clear," calling her concerns "spurious," and recommending that Dukes be investigated and prosecuted. (*Id.*) Dukes responded to Wulfkuhle that she viewed Phillipson's email as threatening and abusive and that she intended to report him to the Equal Employment Opportunity Commission. (*Id.* ¶ 4.) Wulfkuhle then told Phillipson that he should not communicate with his co-workers in that manner. (*Id.*) For his part, Phillipson claims that he did not personally attack Dukes and that he was rightfully pointing out Dukes's culpability for a contract loss of $124,000, which Phillipson believed should have been audited and investigated. (PRSF ¶ 4.)

In December 2012, Wulfkuhle, Preusse, and Andrew Velasquez, Regional Administrator for Region V, received a memorandum from Manny Toro, Chief of Staff in FEMA's New York Office, describing Phillipson's conduct while working in New York. (DSF ¶ 5.) According to the memorandum, Phillipson disregarded a security guard's directions about where to park his vehicle, refused to identify himself to the security guard, and acted aggressively and argumentatively. (*Id.* ¶ 6.) In addition, when Toro's Security Lead, Derrick Thomas, asked

---

[2] Despite Phillipson's claim that FEMA policy only required receipts for expenses greater than $75.00, the evidence indicates that FEMA policy requires receipts for "all amounts expended." (DSF, Ex. 61.)

Phillipson to wait until Toro was ready to speak to him, Phillipson refused to do so. (*Id.* ¶ 7.) When Phillipson met with Toro and Thomas about the parking incident, Phillipson again acted aggressively and argumentatively. (*Id.*) As a result, Toro ordered Phillipson to leave the New York operation and recommended further review and disciplinary action towards him. (*Id.* ¶ 8.) Phillipson denies acting unprofessionally and also denies being ordered to return to Chicago prior to the scheduled end of his trip. (PRSF ¶¶ 7–8.) Wulfkuhle, Preusse, and Velasquez also received an email about the New York incident from Philip Parr, the New York Deputy Federal Coordinating Officer, with additional reports and witness statements regarding Phillipson's conduct. (DSF ¶¶ 9–12.) Parr described Phillipson's behavior as "hostile, inappropriate, and belligerent." (*Id.* ¶ 9.)

After receiving those reports, Wulfkuhle issued an official reprimand to Phillipson for inappropriate behavior. (*Id.* ¶ 13.) The reprimand documented the New York incident, Phillipson's email to Dukes, and a third incident during which Phillipson had raised his voice towards a coworker. (*Id.* ¶ 14.) In February 2014, Wulfkuhle rescinded and reissued the reprimand, replacing the specific details regarding the email to Dukes and the incident when Phillipson raised his voice with a general reference to two prior incidents of aggressive and belligerent conduct towards co-workers. (*Id.* ¶ 15.) When Wulfkuhle attempted to re-issue the updated letter of reprimand, Phillipson refused to come to Wulfkuhle's office, stating, "No. I am afraid that I am busy. If you want to continue this farce, you can do it in the open, in front of everyone with witnesses to your conduct. I am here." (PSRF ¶ 16.)

In July 2013, a FEMA employee submitted a report to Richard Amburgey, Regional Security Officer of Region V, stating that he had observed Phillipson in a "verbal rage" in the office bathroom. (DSF ¶ 26.) According to the report, Phillipson said, "I am not impressed with

8

any of you," at least ten times, and "the incompetence amazing," three or four times. (*Id.* ¶ 26.)[3] Accordingly, Amburgey completed a FEMA security incident report about Phillipson. (*Id.*) Amburgey also notified his supervisor, Mission Support Director James Duncan, about the report. (*Id.* ¶ 27.) Duncan instructed Amburgey to conduct a follow-up investigation, as one of Amburgey's duties was to investigate possible signs of workplace violence. (*Id.*) Amburgey then interviewed six of Phillipson's coworkers to determine whether a formal investigation was necessary. (*Id.* ¶ 28.) The investigation revealed that four employees said that they felt uncomfortable or unsafe around Phillipson. (*Id.*)

FEMA claims that on May 9, 2014, Phillipson called FEMA Branch Chief Lemorris Graham "a damn bully," called Wulfkuhle "a goddamn idiot," and called Preusse a "goddamn idiot." (*Id.* ¶ 36, Ex. 51.) Phillipson denies making these statements. (PRSF ¶ 36.) Then, on May 20, 2014, Graham submitted a witness statement to Preusse stating that Phillipson commonly engaged in loud, angry, unfiltered outbursts in the office and that he had made disparaging remarks, yelled, and cursed at Wulfkuhle. (DSF ¶ 38, Ex. 50.) In response, Phillipson claims that he never had any contact with Graham prior to that point. (Plaintiff's Rule 56.1 Stmt. of Undisputed Mat. Facts ("PSF") ¶ 36, Dkt. No. 62.) Nonetheless, on several occasions thereafter, Phillipson made statements to or about Graham to the effect that Graham was very scared and did not need to be afraid. (PRSF ¶ 39.) For example, on May 29, 2014, Phillipson walked past Graham and another FEMA employee, Rolando Rivero, and stated, "Excuse me, I'm going to pass by you, Rolando, because I don't want to frighten Lemorris." (DSF ¶ 39.) Later that day, Phillipson said to other individuals in the cubicle area, "Everyone needs to make sure they do not

---

[3] Phillipson objects to the alleged statements as hearsay. However, the Court will consider the statements, not for the truth of the matter asserted but for the purpose of evaluating the effect on the listener—in this case, to show that Amburgey had a reasonable basis (other than age discrimination) for completing a FEMA security incident report about Phillipson and interviewing Phillipson's coworkers.

frighten Lemorris, because he is really scared so we need to make sure we don't scare him." (*Id.*

¶ 40, Ex. 52.) Again, later that day, Phillipson said to Graham, "Are you okay, Lemorris? I want

to make sure. I want to make sure you are not scared or anything." (*Id.*) Phillipson claims that he

was merely expressing his concern over Graham's "temperament" and going out of his way to

avoid upsetting Graham. (PRSF ¶ 40.) On June 4, 2014, Wulfkuhle sent Phillipson an email

admonishing him for his statements towards Graham, but Phillipson did not stop. (DSF ¶ 41.)

### D.      Failure to Follow Instructions

Finally, Phillipson was repeatedly confronted and disciplined for failing to follow

instructions. In early 2014, Wulfkuhle asked Phillipson to draft a white paper addressing specific

areas where FEMA Region V needed national policy guidance. (*Id.* ¶ 31.) According to

Wulfkuhle, Phillipson instead wrote a white paper that criticized Wulfkuhle and Preusse. (*Id.*) By

contrast, Phillipson claims that Wulfkuhle asked him to change his white paper to blame agencies

other than FEMA for identified failures and issues, which he refused to do. (PRSF ¶ 31.) On

February 26, 2014, when Wulfkuhle attempted to speak to Phillipson in person about the white

paper, Phillipson told Wulfkuhle he was incompetent, unable to lead, dishonest, and a poor

coordinator. (DSF ¶ 33.)

On March 4, 2014, Phillipson refused to tell Wulfkuhle which of two work-related trips he

would prefer to attend, instead stating that Wulfkuhle was incapable of understanding his

response. (*Id.*) On March 21, 2014, Wulfkuhle proposed a five-day suspension for failure to

follow instructions and inappropriate conduct. (*Id.* ¶ 31.) When Wulfkuhle attempted to deliver

the proposed suspension to Phillipson, he was combative and argumentative, speaking loudly and

unprofessionally for over a minute. (*Id.* ¶ 34.) Wulfkuhle tried to end the meeting and dismiss

Phillipson, but he refused to leave and continued speaking loudly. (*Id.*) Phillipson also called

Wulfkuhle "despicable" and "a coward." (*Id.*) Preusse ultimately approved the suspension on April 7, 2014. (*Id.* ¶¶ 33–34.)

On May 13, 2014, Wulfkuhle met with Phillipson and two other FEMA employees, Sean O'Leary and Todd Lawson, in Wulfkuhle's office. (*Id.* ¶ 37.) In the meeting, Wulfkuhle expressed his dissatisfaction with Phillipson's airing of their disagreements in public. (*Id.*) Phillipson repeatedly interrupted Wulfkuhle, walked towards him, crossed his arms, and spoke loudly. (*Id.*) According to O'Leary, Phillipson's demeanor was loud and belligerent, as if trying to provoke Wulfkuhle into becoming angry or making a misstatement. (*Id.*)

On May 15, 2014, Wulfkuhle asked Phillipson to provide an agenda for an event in Indiana. (*Id.* ¶ 43.) In response, Phillipson accused Wulfkuhle of attempting a "dishonest stunt," stated that "truth, honesty, integrity, or professionalism" could not be expected of Wulfkuhle, and accused Wulfkuhle of unethical, unprofessional, and illegal conduct. (*Id.*) Phillipson also admits that he repeatedly accused Wulfkuhle of lying, cowardice, or incompetence in front of other FEMA employees. (PRSF ¶ 44.) Similarly, on multiple occasions when Wulfkuhle approached Phillipson about work assignments, Phillipson admittedly ignored Wulfkuhle's questions and responded by accusing Wulfkuhle of lying, incompetence, or malfeasance. (*Id.*)

In July 2014, Wulfkuhle asked Phillipson to make certain edits to an improvised-nuclear-device base plan. (*Id.* ¶ 46.) Phillipson responded to each of Wulfkuhle's edits with footnotes stating that he believed the edit to be an error and attributing that error to "Gus Wulfkuhle, Plans Chief in the RV Response Division . . . not the error of the writer or preparer of the plan." (*Id.* ¶ 47.) Similarly, Wulfkuhle had written an edit in capital letters, and Phillipson implemented the edit in capital letters even though the rest of the document was not in capital letters. (*Id.* ¶ 48.) Wulfkuhle also added a footnote to the capital letters, stating, "[T]his task was required by

Planning Section Chief of FEMA Region V, Gus Wulfkuhle, in spite of the fact that it cannot be mission essential." (*Id.* ¶ 49.)

On September 23, 2014, Phillipson was placed on administrative leave with pay. (DSF ¶ 52.) As a condition of his paid leave, Wulfkuhle required Phillipson to check in every day via email. (*Id.* ¶ 53.) Phillipson claims that he did so, but Wulfkuhle suspended him for three days for failing check in on March 6, 9, and 10, 2015. (*Id.* ¶¶ 53–54.) Wulfkuhle also marked Phillipson as "AWOL" for failing to check in on November 2–6, 9–10, 13, 16, 18–20, 23, 25–27, and 30, 2015. (*Id.* ¶ 55.) On November 30, 2015, Wulfkuhle informed Phillipson that he had not been receiving his check-in emails and asked Phillipson to send a new email each day with the subject line "Checking in on {insert date}." (*Id.* ¶ 56.) The following day, Phillipson forwarded Wulfkuhle an email string spanning 25 pages with the subject line, "Wulfkuhles [*sic*] transparent attempt to justify his falsification of federal records and remove evidence of his earlier false official statements by adding new requirements: 'Checking in on {insert date}.'" (*Id.*) Phillipson copied other FEMA employees who reported to Wulfkuhle on this email. (*Id.*)

In response, Wulfkuhle thanked Phillipson for checking in and asked Phillipson not to send him long email strings as his check-in and to put the date of his email in the subject line. (*Id.* ¶ 57.) The following day, Phillipson replied to the email by accusing Wulfkuhle of making false allegations, falsifying government records, abusing his authority, harassing him, abusing him, being incompetent, fabricating false claims, perjury, and criminal activity. (*Id.* ¶ 58.) On December 3, 2015, Wulfkuhle again instructed Phillipson to send appropriate daily check-in emails, but Phillipson still did not comply. (*Id.* ¶¶ 59–60.)

**E.        Phillipson's Grievances and Complaints**

On August 12, 2013, Phillipson filed an Equal Employment Opportunity ("EEO") complaint alleging age discrimination and retaliation. (*Id.* ¶¶ 66–67.)[4] After receiving a copy of the grievance, Wulfkuhle felt upset. (PSF ¶ 31.) In September 2014, the DHS Office of Civil Rights and Civil Liberties issued a final determination against Phillipson, concluding that no action should be taken. (*Id.* ¶ 37.)

In addition, Phillipson testified that in March 2014, after Wulfkuhle issued him a proposed five-day suspension, he approached Richard Marlina, a human resources officer at FEMA, to file a complaint of discrimination but was "rebuffed." (*Id.* ¶ 35.) Phillipson also testified that he then approached Preusse and FEMA counsel Maureen Cunningham to file a complaint but was again rebuffed. (*Id.*) FEMA denies that Phillipson was ever rebuffed. (DRSF ¶ 35.) Further, after Wulfkuhle attempted to terminate him, Phillipson filed a complaint with the Office of Special Counsel in September 2014. (PSF ¶ 37.) Finally, Phillipson testified that he filed complaints with the Federal Bureau of Investigation ("FBI") and United States Attorney's Office ("USAO") in March 2015. (*Id.*) FEMA denies that Phillipson complained to the FBI or the USAO. (DRSF ¶ 37.)

---

[4] Phillipson also states in his Rule 56.1 Statement of Facts that someone named William Hooten said he overheard Preusse discussing ways that he and Wulfkuhle could harass and engage in discrimination and retaliation against Phillipson. (PSF ¶ 6.) The Court declines to consider Hooten's statement because it is inadmissible hearsay. Similarly, Phillipson also references an email from someone named Mayra Lopez-de-Victoria, stating that a FEMA employee in New York named Elizabeth Watson told her that Phillipson was not angry or aggressive with the security officer. (*Id.* ¶ 14.) Again, the Court declines to consider Lopez-de-Victoria's hearsay statement.

Phillipson also claims that "many employees younger than Phillipson were allowed to change their compressed work schedule without permission, such as James Cullen, Brian Morrill, Todd Lawson, and JP Marsch." (*Id.* ¶ 25.) But Phillipson admitted in his deposition that he did not know and had no way of knowing whether those individuals were indeed allowed to change their work schedules, and he cites only to his own deposition testimony as evidence for his claim. (DRSF ¶ 25.)

Ultimately, on April 29, 2015, Preusse issued a Notice of Proposed Removal ("Notice") against Phillipson. (DSF ¶ 61, Ex. 51.) In the Notice, Preusse charged Phillipson with inappropriate conduct based on his disparaging remarks to Wulfkuhle and Graham. (*Id.*, Ex. 51.) Preusse also charged Phillipson based on his failure to follow Wulfkuhle's instructions on multiple occasions and his failure to follow written agency policy for changing his compressed work schedule without first obtaining supervisory approval. (*Id.*) On December 14, 2015, Pat Hernandez, Deputy Assistant Administrator, removed Phillipson from his position, sustaining each of the three charges Preusse listed in the Notice. (*Id.* ¶ 62.)

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be granted "when no reasonable jury could find in favor of the non-moving party." *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* In this case, Phillipson has set forth two employment discrimination claims against FEMA under the ADEA—one based on age discrimination and the other based on retaliation. FEMA claims there is no genuine issue of material fact with respect to either one.

### I.    Age Discrimination

Courts in this Circuit assess ADEA claims in the same way as Title VII claims. *Little v. Ill. Dep't of Pub. Health*, No. 16-CV-10377, 2017 WL 5903835, at *7 (N.D. Ill. Nov. 30, 2017)

("The test for ADEA discrimination is virtually identical to the framework for Title VII discrimination." (internal quotation marks omitted)). Thus, courts consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). One way of proving a claim is through the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). This framework allows an ADEA plaintiff to set out a prima facie case for discrimination by showing that: (1) he is a member of the protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees outside of the protected class were treated more favorably. *David*, 846 F.3d at 225; *see also McDonnell Douglas*, 411 U.S. at 802. If a plaintiff's evidence establishes a prima facie case of unlawful discrimination, "the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). Where the employer carries its burden, the burden shifts back to the plaintiff to establish that the employer's stated nondiscriminatory reason is a pretext. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015).

Phillipson asserts that he has sufficient evidence to show age discrimination under the *McDonnell Douglas* method. As a preliminary matter, the parties do not dispute that Phillipson was over the age of 40 years old at all relevant times, which means that he is a member of the protected class under the ADEA. 29 U.S.C. §§ 623(a)(1), 631(a). However, Phillipson has not identified a genuine dispute of material fact about whether his job performance met FEMA's legitimate expectations. Phillipson contends that he received "superior evaluation [*sic*]," but the

only evidence he offers in support is his own deposition testimony. (PSF ¶ 4.) While it is true that a "nonmoving party's own affidavit or deposition can constitute affirmative evidence to defeat a summary judgment motion, conclusory statements . . . do not create an issue of fact." *Mills v. First Fed. Sav. & Loan Ass'n of Belvedere*, 83 F.3d 833, 843 (7th Cir. 1996) (citations and internal quotation marks omitted); *see, e.g.*, *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) ("Plaintiff's own general averments of adequate performance are insufficient to create a factual issue to defeat summary judgment."). And here, Phillipson's self-serving statements are without factual support in the record.

FEMA has provided performance letters indicating that Phillipson received negative reviews describing his performance and work quality as "less than expected." (DSF ¶ 29, Ex. 38.) Also, Wulfkuhle testified that he reprimanded Phillipson and recommended his suspension on multiple occasions. (*Id.* ¶¶ 4, 13, 17, 31–32, Exs. 40, 45); *see Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (affirming summary judgment where plaintiff did not dispute that he repeatedly received negative performance assessments). Moreover, the record contains abundant evidence that Phillipson was falling short of FEMA's legitimate expectations as to his professionalism when interacting with coworkers, his compliance with FEMA policy, and his willingness to follow his supervisor's instructions.

Phillipson's assertions of superior job performance are flatly contradicted by: (1) Toro's memorandum and Parr's email documenting Phillipson's hostile conduct in New York (DSF, Exs. 10–17), (2) Amburgey's investigation results, which indicated that at least four of Phillipson's co-workers felt uncomfortable or scared around him (*Id.*, Exs. 36–37), (3) Phillipson's repeated conflicts with Graham (*Id.*, Exs. 48, 50–53; PRSF ¶ 39), (4) recurring issues regarding Phillipson's use of his government charge card and his requests for reimbursement of

his travel expenses (*Id.*, Exs. 20–29), (5) recurring issues regarding Phillipson's unexcused absences from work (*Id.*, Exs. 31–34), and (6) Phillipson's own admission that on several occasions, he either refused to comply or followed the letter but not the spirit of Wulfkuhle's instructions (PRSF ¶¶ 16, 33, 43–50). Ultimately, Phillipson's reference to his own deposition testimony is insufficient to contradict the substantial evidence of FEMA's discontent with Phillipson's job performance. Based on the entire record, no reasonable juror could credit Phillipson's assertion that he was meeting FEMA's legitimate expectations.

Nor has Phillipson shown a genuine dispute of material fact regarding whether similarly situated younger employees were treated materially better than him. To do so, a plaintiff must show that "members of the comparative group are directly comparable to [him] in all material respects." *Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008) (internal quotation marks omitted). Here, Phillipson claims that "several other individuals in his department, Jonathon Marsch and Jim Cullen who both were under 40 years of age and Brian Morrill, in his mid-40's . . . were treated better." (PSF ¶ 2.) But Phillipson has not provided any evidence regarding his comparators' actual ages, which is "relevant to the ultimate question of discriminatory intent." *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 304 (7th Cir. 1996). And even more critically, other than his own self-serving and conclusory statements, Phillipson has not put forth any evidence that these employees were similarly situated to him. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (holding that relevant factors include "whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience, and qualification"). Phillipson also has failed to present evidence that the other employees were treated better despite engaging in the same conduct; for example, the Court has no basis for concluding that Phillipson's named comparators

were also reviewed as "less than expected," charged with violating FEMA policy, accused of harassing their coworkers, or disciplined for insubordination. *See Henry v. Jones*, 507 F.3d 558, 566 (7th Cir. 2007) (finding employee did not identify appropriate comparators where "[h]is conduct was more egregious than that of the non-white officers he highlights").

In sum, Phillipson has not demonstrated that he was meeting FEMA's legitimate employment expectations, nor has he presented evidence that any younger, similarly situated comparator received more favorable treatment. Accordingly, he has failed to meet the requirements to proceed under the *McDonnell Douglas* burden-shifting method of proof. The Court therefore grants summary judgment in favor of FEMA as to Count I of Phillipson's complaint.

## II.     Retaliation

The Court next turns to Count II, Phillipson's claim of retaliation in violation of the ADEA. A plaintiff may avoid summary judgment on his retaliation claim by presenting sufficient evidence from which a reasonable jury could conclude that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the two. *Smith*, 674 F.3d at 657.

As to the first requirement, the parties do not dispute that Phillipson filed a grievance and EEO complaint claiming age discrimination, which qualifies as a protected activity. (DSF ¶¶ 66–67); *see Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018); *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011) (explaining that making a formal complaint is "the most obvious form of statutorily protected activity"), *overruled on other grounds*, *Ortiz*, 834 F.3d at 764–65. To show an adverse employment action, as required by the second requirement of the direct method of proof, a plaintiff must show "some quantitative or qualitative change in the terms

or conditions of [the plaintiff's] employment." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (internal quotation marks omitted). Phillipson contends that he suffered the following adverse employment actions:

(1) Wulfkuhle denied his request for sick leave on two occasions;

(2) Phillipson's supervisors directed Amburgey to ask his coworkers whether Phillipson had ever been hostile towards them;

(3) Wulfkuhle issued him performance reviews indicating that his performance was "less than expected";

(4) Wulfkuhle issued him a five-day suspension and later a three-day suspension;

(5) Wulfkuhle improperly requested that his time card be invalidated;

(6) Wulfkuhle falsely accused him of not completing an assignment;

(7) Wulfkuhle repeatedly rejected his requests for travel reimbursement;

(8) Wulfkuhle falsely charged him with being absent from work; and

(9) he was terminated.

(*See* Second Amended Complaint ¶ 31, Dkt. No. 40.) But Phillipson has not shown that each of these events affected the terms and conditions of his employment. *See Madlock*, 885 F.3d at 470 (finding no adverse employment action where plaintiff suffered "no reduction in salary, loss of benefits, nor even a loss of title"); *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (holding that negative performance reviews, written warnings, and placement on "performance improvement plan" do not constitute adverse employment actions). Quite frankly, "not everything that makes an employee unhappy is an actionable adverse action." *Madlock*, 885 F.3d at 470. Consequently, out of the list

provided by Phillipson, the only events qualifying as adverse employment actions are his suspensions and termination. *See id.*

Turning to the third requirement, Phillipson must establish "but-for" causation by showing that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Causation may be established through circumstantial evidence, including "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Phillipson claims that the suspicious timing surrounding his suspension and termination and the "unworthy," pretextual explanations given by FEMA constitute evidence of retaliation.

As to timing, Phillipson filed a grievance and EEO complaint in August 2013 but was not suspended for the first time until February 2014. (PSF ¶¶ 7, 34.) Based on this timing alone, no reasonable juror could connect Phillipson's grievance and complaints with his suspensions and eventual discharge. *See Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (holding that a three-month period between a protected activity and adverse employment action, on its own, is insufficient to create a jury issue on the inference of retaliation). Phillipson has a stronger argument for suspicious timing based on his claim that he filed additional complaints in March 2015, and Preusse issued the Notice of Proposed Removal in April 2015. (PSF ¶ 37; DSF Ex. 51.) Notwithstanding the fact that Phillipson has provided no evidence of the March 2015 additional complaints besides his own testimony, the Seventh Circuit has consistently held that suspicious timing is rarely sufficient in isolation to support a case of retaliation. *Hobgood v. Ill.*

*Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013). Accordingly, Phillipson must present additional evidence to defeat summary judgment, which he attempts to do by claiming pretext.

But Phillipson's claim of pretext is utterly unsupported by the record. To show pretext, an employee "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason that a reasonable person could find [it] unworthy of credence." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (internal quotation marks omitted). Phillipson's only evidence that he was punished despite being a "faithful, truthful and conscientious employee" is his own deposition testimony and sworn declaration and Wulfkuhle's admission that he felt "upset" after receiving notice of the grievance. (Pl.'s Mem. Of Law In Opp'n to Def's Mot. for Summ. J. at 16, Dkt. No. 63; PSF ¶ 31.)

By contrast, FEMA has provided abundant evidence that it based each of Phillipson's suspensions on specific incidents of misconduct and unprofessionalism. Regarding the suspension proposed in April 2013, Phillipson failed to pay the undisputed balance of his travel charge card on time and used the card for a personal meal.[5] (DSF ¶ 17, Exs. 20–22.) And regarding the suspension proposed in March 2014, Phillipson failed to follow instructions regarding two white paper assignments, refused to meet with Wulfkuhle regarding a letter of reprimand, sent inappropriate emails, told Wulfkuhle he was "incompetent, unable to lead, dishonest, and a poor communicator, and refused to answer a question and instead responded that Wulfkuhle was "incapable of understanding [Phillipson's] response." (*Id.* ¶ 33, Ex. 40.) Similarly, regarding the suspension proposed in March 2015, Phillipson failed to send appropriate daily check-in emails to Wulfkuhle, a required condition of his paid leave. (*Id.* ¶¶ 53–54.) In the same vein, FEMA

---

[5] Phillipson counters this accusation by providing an affidavit from the general manager of Bennigan's stating that an issue with the restaurant's computer system may have caused charges to reflect the wrong date. (PRSF ¶ 17.) Even accepting Phillipson's evidence as true, the affidavit does not support a claim that Wulfkuhle's inclusion of the Bennigan's allegation is so weak, implausible, inconsistent, or contradictory that it must have been pretextual.

terminated Phillipson for "inappropriate conduct, failure to follow instructions, and failure to follow written agency policy." (*Id.* ¶ 62.) Preusse's Notice of Proposed Removal listed ten specific incidents where Phillipson acted inappropriately towards Graham and Wulfkuhle, five specific incidents where Phillipson failed to follow Wulfkuhle's instructions, and one incident where Phillipson failed to follow written agency policy. (*Id.*, Ex. 51.) Furthermore, the record is replete with additional examples where Phillipson violated FEMA policy, harassed his coworkers, and refused to comply with Wulfkuhle's directions, which are supported by testimony, affidavits, emails, and memoranda.

In the end, no reasonable juror viewing all the evidence as a whole could conclude that Phillipson was suspended or terminated in retaliation for his grievance and complaints. Therefore, the Court grants summary judgment in favor of FEMA as to Count II as well.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 51) is granted. The Clerk will enter Judgment in favor of Defendant.

ENTERED:

Dated: September 30, 2019

Andrea R. Wood
United States District Judge